Next case. 111-3646 Russell Mantros v. Exxon, 88, Carmel, Memphis. Counsel, you may approach. Thank you, Your Honor. Good morning, Justices. Good morning, Mr. Gibbons. My name is Ivan Emmerenberg. I represent the injured worker, Mr. Mantros, Russell Mantros. Mr. Mantros was found to be fully credible by the commission, meaning the respondent threw everything but the kitchen sink at him. They said he was sleeping in the car. They said he was malingering, a psychiatric condition. They said he went on vacations and read the arbitrator's decision and the commission's decision, and there is no problem with his credibility. Then why did the commission find against your client? Well, because of mistake of law, and we'll go through that. They had every opportunity. They could have said he was malingering. They didn't. They found it a legitimate psychiatric injury, but they said that the injury arose from a labor management dispute. Let's start with the fact that for 14 years, from 1988, actually 15 years, to 2003, he had no problems with the company. He was the best producer of lamps, the highest producer there was, until all his supervisors said they had no problems with him. He was getting kudos. His co-workers came in and said that the company would post a list of people who were outstanding, and Russ was always at the top of the outstanding. What changed? He got injured. After he's injured, this major corporation had a pattern and practice of violating Illinois law. They violated 4H. They communicated with his doctor. They demanded he return to work. They threatened to fire him if he didn't comply with an IME opinion. That's not Illinois law. That's contrary to Illinois law. A recent public court case grabs his right on point. You can't do this. But it is significant. It is significant that 4H deals with responses by employers. Before we get into it, I don't think, I mean, setting that aside, here's something I'd like you to hone in on. Your client treated with Dr. Ibrahim, correct? He treated with Dr. Ibram. He treated with Dr. Smith. And he treated with Dr. Reif. With Mollet, plus a psychologist. I don't think anyone disputes that your client suffered a right shoulder injury on April 23rd, 2003. Your client goes to Dr. Ibrahim. He, the doctor, this isn't the commission pulling this out of the air and looking back into labor disputes, says, the doctor, quote, he diagnosed anxiety and depression secondary to the change of the patient's life, which is a potential for him to lose his job. The doctor goes on to indicate that the claimant's condition is attributable to disciplinary action and respondent's management style. The committee noted there is no indication in Ibrahim's office notes that the claimant's condition of ill-being was attributable to the work-related shoulder injury. So why can't the commission accept the treating doctor's opinions? Well, first of all, they didn't, because let's look at what he testified to. The meaning of the note. The only condition secondary to changes is in petitioner's life. There were only two changes in petitioner's life. His shoulder was injured and then his other shoulder was injured. And their response to him as an employee changed. There are no other changes. What changes in his life did the commission point to? So does Dr. Ibrahim provide a causal connection? Yes, of course. He testified to it. He testified to the meaning of his note, which they. All right, here's what he testifies to. The course of treatment as I continued to follow him up with him, it became more obvious. He suffers from depression and anxiety. The main focus of that in him is his fearful of losing his job and the way the employer handles his injury and taking care of his paperwork and issues related to him going back to work and feeling himself like he was under pressure mentally and psychologically. That's what Dr. Ibrahim testified to. And you believe that's the equivalent of a testimony that the psychological injuries are the result of the shoulder injury? He says his injuries. And when he says in the note, anxiety and depression most likely secondary to change in patient's life. That's the only change in the patient's life, Your Honor. There is no other change. There are only two changes. And Bozian says if a first cause causes a second cause, the first cause is the cause of the second cause and the resulting injury. That's Illinois law. That's what causation is. It's like this. First of all, we'll go back. Let me just say something on 4-H. 4-H says you can't discriminate. Our Supreme Court said that there's no action outside of the workers' comp commission for any improper violation of the act by the employer short of termination. They have no problem with that. But that means that violations of the act that are short of the termination are still covered by the act. So he has a right to delect that remedy, that their reaction to his injury. Remember, he was a good employee with no problems. What is their reaction to his injury? What does any of this have to do with whether or not his psychological injuries that he's claiming and seeking compensation for are the direct and natural result of the shoulder injury? What does any of this have to do with that? Well, he comes back. First of all, they communicated, ex-partied with his treatment physicians, violating his syndrome, violating 4-H. He knew they wanted him back to work. He's released by Dr. Smith at his own request. Not a full release. The doctor wrote it in his note. I'm releasing him back to work in 2003 at his request. Why? He's getting pressure from his employees, employers. He's scared to death he's going to be fired. They said they were going to fire him if he didn't come back to work. He comes back to work and what's their response? Oh, we want you to do 15 to 20 amps a day. He tells them right away, this is hurting me. I can't handle it. This is too much for my shoulders. Now, I have a question for this panel. Does the law of Illinois mean anything? They're not supposed to discriminate. I never saw anything so outrageous in my 40 years of practice in workers' comp. Who bears the burden of proving a claim before the commission? We do. And I believe we've proved it. So the conduct of the employer behind the scenes you believe has something to do with that claim? It wasn't behind the scenes. It was out front and in the face of everybody. They saw it. And that's why the arbitrator wrote what he wrote. Mr. Rittenberg, you have to stay close to that device because it's recording your words for posterity. You'll be lost for posterity if you don't stay close. We'll stay close. Thank you, Justice Hoffman. They tell him do 15 to 20, which the union writes is impossible. All right? The guy at Jackson gets promoted into position. He only did 8 to 12. These are the street lamps you're talking about? Yeah, the street lamps. 8 to 12. He gets promoted. He's never written up. This is a corporation that has literally thousands of employees and at least hundreds of these linemen. And he's the only one. He's the only one in this entire company after he's injured who they call in and say you've got to do 15 to 20. He complains about them. It's hurting him. It's hurting him. Can I ask you then, Mr. Rittenberg, was it reasonable for Cameron to set the number at 18 based on the claimant's own estimation as to what he could do in an hour? He said he could do 3 in an hour. Cameron sets then the number at 18 based on 6 hours. Was that reasonable? First of all, that he could do 3 in an hour under ideal situations. That means that the lamp is not rusty. The arm is not injured. And all he has to do is open it up and replace the bulb. Okay? But real life doesn't work that way. Those street lights are out there for 30 years and now they're in all sorts of conditions. That's, in fact, how he got hurt is he was working on one of these older lights and it broke away from the Because he can't let it drop. It could hit somebody. It could hit his vehicle. And he's injured. But in response to his, and they say, remember, they say malingering meant the petitioner's failure to produce 15 to 20 repairs per day. They did no study. He came back under duress. He wasn't released by Dr. Smith. He told them it was hurting him. He wrote to personnel. He did everything he could. And why does the commission stop at just the July thing when he gets in and sees his doctor and tells him how he's feeling? By the way, Dr. Smith diagnosed, I mean not Dr. Smith, but yes, Dr. Smith diagnosed the re-injury in the shoulder, an aggravation of his situation that they didn't treat. And when he came back from his suspension, they had him sign a thing that he tried to do the 15 to 20. They're asking him to do impossible. Why would he out of hundreds of linemen be the guy? This all goes back, and then we got testimony that their bonuses were affected because he was out. And I've never had an employer, they come in and the superintendent, the one who wrote him up, testifies, oh, yeah, sure, a lot of guys do 15 to 20. I ask him, well, name me one. He turns it over, do I have to? Then he admits on the record nobody. Is it reasonable? I ask this question. Is it reasonable amongst all their hundreds of employees and all their experience that they pick up Mr. Matros and ask him to do 15 and 20? He's not the only lineman out there doing lamps. Why this discrimination? It has to come, never existed before this comp case. And why did they stop with the analysis with this thing in July when he re-injures himself in October trying to do the 15 to 20? By the way, his boss came out and watched him do 11 in nine hours and said that was great work. But they're still asking him to do 15 and 20. And he's an employee. Is that unusual? Is that different? Is anybody else in the workplace getting it? Three coworkers testified how they hated him because he was always having injuries. How his boss was striped against him. There are other things going on aside from what you would characterize as these work shortcomings, his inability to do the number of lamp changes per day. There are things that are noted in the record in regards to the sleeping in the truck. They never proved he was sleeping in the truck. Okay. He had a sleeping bag and a pillow in his truck. And that is allowed because you know what they do with those trucks? When there's a thing out in another state, they drive them out there. We just had it with New York and they had some snow. And they're allowed to have that stuff in the truck. Okay. What about the period of time where he's claiming that he's working on these feeder maps but he's on the floor of the truck examining these apparently for over an hour at a time? Well, the commission didn't find that he lied about it. And he's allowed to work on the feeder maps. And if you look at the reinstatement agreement, it only had to do with him doing the impossible, 15 to 20. And, in fact, the only reason they investigated him was because he wasn't doing. They sent their guys out to film him. Because he was malingering meant Fishner failed to produce 15 to 20 lamps per day. You know, it's easy. They didn't. I don't believe any of them. When a guy is under old, their superintendent prepared to lie. And then when he's caught in the lie, he has to back off and say, I don't know anybody who does 15 to 20. I asked them to have records. Do you keep records on what these linemen do? Yes. Could you have brought me a record showing anybody doing 15 to 20? No, they couldn't produce the record. Why is it always the worker who's the phony? Can't there ever be the company? Can't there ever be the bad guys? I think there were bad guys here. They put this man under tremendous pressure. And I asked myself, why would the commission stop at just the first accident? Remember, he doesn't get psychiatric care on him until the second accident. And what was their response to the second accident? Oh, it didn't happen. Why? Because the lamps, and these lamps are taken in and out of supply, wasn't there two weeks later. And he gave a consistent history to his bosses and to their medical department. Why is it that the poor working man, I know he doesn't work a billion dollars and he doesn't employ thousands of, why is he the bad guy? All he did was come to work. He went to work against his doctor's advice trying to satisfy these people. And what was his benefit for? More pressure. And it's only after the second incident where they said, no, you can go back to work. And when they got to their own experts, these are all legitimate shoulder injuries, that he gets active psychiatric care. So even, so, and he has pain at the second one. Why did the commission stop their analysis and say, well, this active psychiatric care, that was in whole or part? Because then he was in physical pain. A lot of physical pain, too. But he was in physical pain at the time he comes in and he tells Ibrahim about what's happening at work. Because he sees the next day he gets to see Smith. And he testified that he called Smith in June and he couldn't get an appointment until July 19th. Because you can't get into orthopods that easily, we all know that, unless it's an emergency. Counsel, your time is up. Thank you. Counsel, you'll have time on reply. I just, if I could just remind that if the first cause is a shoulder injury and under no, but for the shoulder injury, this response would never have occurred. Counsel, you have time on reply. Good morning, Justices. Good morning, Mr. Rittenberg. May it please the Court, I'm Christopher Gibbons and I represent Commonwealth Edison in this matter. We're here on this appeal of two claims by Mr. Matros that he brought at the Illinois Workers' Compensation Commission for injuries sustained on April 23rd of 02 and March, or rather October 3rd of 03. We then went to trial under Section 19B before the Workers' Compensation Commission and he sought workers' benefits related to an alleged mental health condition. His initial shoulder injury was accepted and benefits were paid in relationship to that. Following that trial, the Workers' Compensation Commission eventually ruled that his mental health condition was not related to either of the two cases he had filed alleging shoulder injuries. And obviously, your opposing counsel takes vigorous dispute with the ruling of the Commission, so can you tell us succinctly the basis for upholding the Commission's decision? Absolutely. The Commission's decision is within the manifest weight of the evidence. There are tons of facts in this case, and I'll highlight a few supporting it. And the question is not a legal question. It's a straight causal connection analysis of the sort that's been done all the time by the Commission that's within their special expertise. And that is afforded the manifest weight of the evidence. So what evidence supports the Commission's decision? What specific evidence in the record supports the Commission's decision? Mr. Matros injured his shoulder in April of 2002. He received ñ well, he worked until July, and then he went under medical treatment and had surgery. He came back to work at full duty. He worked throughout the end of March, April, and May, and June at full duty with no medical restrictions. There's no medical notice. We know the history. Let me refine my question. Yeah. Obviously the Commission found, did they not, that there was no causal connection between the defendant's ñ excuse me ñ the claimant's shoulder injuries and the alleged psychological issues. Absolutely. The Commission found there was not that connection. Right. What did they base that on? The fact that there was no development of psychological symptoms at the time of the shoulder injury or following his recovery from the shoulder injury, it was a straight orthopedic case, to which the medical records show he had an excellent recovery. Secondly, when he went and sought mental health treatment, he gave a history of being worried about his suspension at work and this event in the summer of ñ in July of 2003 when he was suspended from work because he was found sleeping in his truck. The October accident, really there was no involvement of that in his mental health condition as well. Is there medical evidence, counsel, in this record to support the Commission's decision? I'm sorry? Is there medical evidence in the record? Absolutely. And what is that medical evidence? It's a testimony of Dr. Abraham, his personal physician who knew him best and first treated him, and the testimony of Dr. Reff. And what did they say? Dr. Abraham testified that, in essence, he got upset and anxious over what was going on at work with his suspension and fear of losing his job. Dr. Reff, once he was provided all of the information in the case, concluded first that his mental health condition existed, but it wasn't related to his injury. It was related to his work-related disputes. Then he later concluded that it wasn't even legitimate he was malingering once he saw additional evidence of his activities that were inconsistent with major depression. Did any of the doctors in this case opine that the claimant's psychological injuries were connected to the shoulder injuries? There was testimony of a very vague and general nature that shoulder injuries involve pain, and pain can cause depression. There was no specific persuasive testimony, and that's what the Commission evaluated and certainly found that wasn't the case when they found no causal connection. So what Mr. Rittenberg then moved to in his argument was that there is no medical chain of connection between the shoulder injuries and the mental health connection. Rather, there's some sort of physical injury, work-related dispute, and then the work-related dispute causes the mental health trauma. That's not, in the cases he cited, none of them support the proposition that the Work Compact would include that type of analysis in a causal connection case. Because Bosian and Northern Illinois in those cases are all the medical consequences of an initial injury down the road, either, you know, some are heart attack cases or suicide cases, but there's some medical connection. And so I don't think the case does support the premise that this employment dispute, which, by the way, arose because they had a backlog of streetlights. His boss said, I need you to knock out more streetlights than you're doing. He didn't. They put him under surveillance, and he was shown sitting in his truck for hours at a time doing no work. He testified that when he left the yard, he was the boss of his truck, and he did what he wanted to do. And he further testified that most days he would spend between two and a half and up to four hours not doing, sitting in his truck. So the change in his life, the change in his life was he was asked to do more work. The development was when he didn't and his employer found out that he was sitting in his truck and not working was to suspend him. It's entirely reasonable. Could an employer's conduct subsequent to an industrial accident ever be so outrageous as to give rise to psychological that's compensable? Could that happen? Yeah, I think one could theorize, and I think that the framework for doing so under the Workers' Compensation Act would be a mental-to-mental type of analysis. So in this case, I think what he's trying to do is get around that analysis. Mr. Matros could have filed a mental-to-mental claim stating that July of 2003 he sustained a mental trauma that resulted in a mental disability. The reason he didn't is it's not a pathfinder situation. Getting suspended for being found sleeping in your truck is one of these day-to-day occurrences that are normal employer-employee stress. And under the GM Parts case, it doesn't give rise to the significant prolonged actual stress that would give rise to the more gradual mental-to-mental. So you don't have pathfinder, you don't have GM Parts. I think he could have brought that case, and I think he should have if he wanted to make this argument. Yeah, but does it have to be the incident of suspension? Could it have been earlier that there was behavior on the part of the employer leading to a mental condition? Well, I think in theory, an employer could do things that were so outrageous that it would give rise to a mental-to-mental case. There are some cases out there. The facts in this case in no way support that. Furthermore, the commission got all these disputed facts, and, you know, for every, you know, he has only cited in his brief and in his argument a most extreme interpretation and I think at times totally wrong account to the facts. I mean, Commonwealth Edison resents being told they're picking on this guy, that they're being evil, they're mean. We have a guy who we paid full benefits to. He's not under any medical restriction, and he gets in this back-and-forth with his employer over basically who's the boss. Does he get to decide what he's going to do, or is it reasonable for his employer to say you can't sit in the truck doing nothing? He had his shirt off, his shoes off, his pants rolled up, and he was sitting there talking to his girlfriend. I mean, if our employees, if your employees decided they weren't going to do work and that's what they're going to do and they tell you that that's what they're going to do, you might have an issue with that, too. So I think that's the fundamental facts of this case. And so I vehemently disagree that the respondent was in any way inappropriate or unfair or discriminatory towards this employee. So to wrap up, I don't think the current Workers' Compensation Act supports his contention. I don't think our case law supports his contention. The court looked at a similar allegation in Lee where a claimant said he cut his thumb, and to get medical treatment for the thumb, he got in his car and drove to the doctor. While on the way, he was involved in an automobile accident and hurt his knee. And he brought a claim saying the knee is related to the thumb because of the automobile accident, and they denied benefits and found no causal connection because that, again, was not a medical causal connection between the thumb and the knee, but a sequence of events similar to this one. And certainly the commission is not, I mean, he, of course, can avail himself and is availing himself of the circuit court in pursuing an employment action to debate all those other issues. But the commission in this decision on causal connection, you know, has properly analyzed the medical evidence, properly taken into account all of his arguments and his witnesses. And by the way, I put on supervisors that said other employees did more lights. The Anthony Cameron's testimony as to how he came up with 18 was reasonable. And I put in evidence showing him changing a light bulb, and it took him a total of five minutes to set the truck up, go up, and change one. So we have lots of evidence showing that the expectation was not unreasonable. You can just put together his own testimony as to how much time he spent idle during the day and say, well, we'd like you to work during that to reason that it was reasonable. And, in fact, there were employees doing that type of work. He was the only one who testified who was only a lamper. So I think that, and I point out, he was the only person in this case who was also filmed sitting in the truck doing nothing. So, you know, he didn't put on other witnesses that said, we don't work our full shift. In fact, they all admitted that it would be unacceptable for them to not work for two hours and sit in their truck if they wanted to. So I think those disputes are, in essence, a red herring in this case. I think that it is a straight medical causal connection case properly decided by the commission. The circuit court properly applied the manifest way to the evidence standard. And we would request that this court affirm that ruling using that standard as this decision being well within the manifest way of the evidence. Thank you, Counsel. Thank you. Counsel, you have five minutes in reply. Thank you, Your Honors. When he came back from work, again, he wasn't released by his treating doctor. We do document the fact that they communicated with the treating doctor. We do document the fact that they gave him an order to return to work that was unlawful, violated 4H. We do document and they admit that he testified when they gave him the 15 to 20 that it was hurting him and causing him problems. Now, all this stuff about this is all conjecture. He wasn't fired for sleeping in the truck. And the report, a consideration for the desire to fire him was repeated injuries in the workplace. That's in their documents. We honed that in from the internal subpoena documents dealing with that two-week suspension. Why was that in there if they weren't all bent out of shape because he had been injured and taken a lot of time off work for that injury? Malingering. He wasn't suspended for anything but malingering. There isn't a charge sleeping in the truck because there was no evidence of sleeping in the truck. I didn't see his head down. They know the people do the maps in the truck. These are big trucks. Malingering meant petitioner's failure to do 15 to 20 lamp repairs a day. Now, how reasonable is he as, by the way, Mr. Jackson also worked as a lamper. He said he did 8 to 12 and was never disciplined and never told to do 15 to 20. That looks like discrimination to me. Three 20-year employees said it was impossible to safely do that number. The union wrote a letter and said it was impossible. You think maybe they were setting this guy up to fire him because he had cost them their bonuses by being injured? And nothing says that the psychiatric injury has to occur immediately after physical injuries. The psychiatric injury was the result of his pain. In combination with an employer who jumped on this man's back and asked him to do the impossible, when he came back to work, he wanted to save his job. He came back against medical advice. By the way, Dr. Moulet, who's a psychiatrist, testified very clearly as to causal connection with the physical pain and shoulder injury plus the way the employer treated him. So did the psychologist and Dr. Reif's first two reports. That's their expert. Their first two reports said it was a result of a work-related injury and pain and the employer's response to that. His second report said the same thing. Review the third. This is their hired expert. The third time, and they sent them some videos, and within a week or five days of that video, the guy's back to work. He's been released full duty. He says, oh, well, maybe he was malingering. Commission didn't believe he was malingering. And in that third report, he says this guy isn't coming back because he's afraid he's going to be fired. Within three days of that report, our guy, with no knowledge of the report, had already returned to work. So, you know, Reif went from 100% on our guy's side to 50% on our guy's side to, oh, he's malingering. But Reif's their hired expert, and it took three reports to get there. Counsel, your time is up. Thank you very much, and thank you for your time. This matter will be taken under advisement. This position will issue.